**Entered on Docket**
**April 19, 2005**

_Bruce A. Markell_
_____
**Hon. Bruce A. Markell**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

|  |  |  |
|---|---|---|
| In re: | ) | |
| PATRICK FULLMER, | ) | BK-S-03-23102-BAM |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| SCOTT ACTON, | ) | Adv. Proceeding No.: 04-1228 BAM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | DATE: April 5, 2005 |
| | ) | TIME:  1:30 p.m. |
| PATRICK FULLMER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**AMENDED AND RESTATED OPINION**
**ON REQUEST FOR STAY PENDING APPEAL**

Scott Acton ("Acton") applies for a stay pending appeal of this court's judgment denying him specific performance of a land sale contract ("Contract"). Specifically, he seeks a stay of this court's order that his lis pendens against the property subject to the Contract be expunged.  The court will deny Acton's application.

Patrick Fullmer ("Fullmer") filed a Chapter 11 case in October of 2003.  As explained below, part of the reason for Fullmer's filing was to reject certain executory contracts for the sale of four parcels of land, with the intent to then resell them at a higher

1  price.  After Fullmer successfully rejected these pre-petition contracts, he entered into a

2  process, approved by the court, to resell the parcels for 60% more than the pre-petition

3  price.

4          One of the buyers in this process was Acton.  As set forth below, a dispute arose

5  during July of 2004 over when Acton had to pay the purchase price.  When that dispute

6  could not be resolved, Acton filed an adversary proceeding against Fullmer for specific

7  performance of Fullmer's obligations to improve the land, and for a conveyance of the land

8  after the price was paid.  To preserve his right, Acton also immediately filed a lis pendens

9  against the land.

10          Trial on this adversary proceeding was held on March 5, 2005.  Each side filed

11  post-trial briefs on March 11, 2005.  The court entered judgment for Fullmer and against

12  Acton on March 25, 2005.  A written opinion setting for the grounds for this judgment was

13  also entered on that date.

14          Following entry of judgment, Fullmer has moved: (1) to expunge the lis

15  pendens; (2) for authority to sell the land at issue to another person; and (3) for attorneys'

16  fees due him under the terms of the Contract.

17          Acton filed his notice of appeal on March 30, 2005.  By this application, Acton

18  seeks to stay or prevent items (1) and (2) above.  Despite the filing of a notice of appeal,

19  this court has jurisdiction to hear Acton's motion.  Ho v. Dai Hwa Elec. (*In re* Ho), 265 B.R.

20  603 (9th Cir. B.A.P. 2001).

21  **I.          Applicability of Rules 7062 and 8005**

22          This action arises out of an adversary proceeding, and thus the 7000 series of

23  rules of the Federal Rules of Bankruptcy Procedure apply.  Rule 7062, in turn, incorporates

24  the provisions of Rule 62 of the Federal Rules of Civil Procedure.  Acton believes that Rule

25  62(d) applies to this case.  That rule states:

26          (d) **Stay Upon Appeal**.  When an appeal is taken the appellant by

1    giving a supersedeas bond may obtain a stay subject to the

2    exceptions contained in subdivision (a) of this rule. The bond may be

3    given at or after the time of filing the notice of appeal or of procuring

4    the order allowing the appeal, as the case may be. The stay is

5    effective when the supersedeas bond is approved by the court.

6        In this regard, Acton asserts that a stay is his right under Rule 62(d)  upon

7    posting of an appropriate bond.  *See, e.g.*,  11 CHARLES A. WRIGHT, ARTHUR R. MILLER &

8    MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2905, at 520 (2d ed. 1995)

9    (indicating that "[t]he stay issues as a matter of right in cases within Rule 62(d)."); 12

10   MOORE'S FEDERAL PRACTICE § 62.03[1] (3d ed. 2005) ("An appealing party is entitled to a

11   stay of enforcement as a matter of right under Rule 62(d) if a supersedeas bond is filed

12   with the court.").

13       The initial issue, however, is whether Acton's appeal falls within Rule 62(d).

14   Acton throughout this case has not sought damages for the alleged breach, but has

15   steadfastly demanded specific performance.  Fullmer's judgment on his counterclaim is

16   also non-monetary.  He sought and received a judicial determination that Acton had

17   materially breached the contract, and that such material breach was grounds for

18   termination of the contract.  The result is that all relief requested and ordered was non-

19   monetary in nature.

20       Cases are uniform, however, that Rule 62(d) pertains primarily, if not

21   exclusively, to monetary judgments.  NLRB v. Westphal, 859 F.2d 818, (9th Cir. 1988)

22   (defendant's motion for stay upon issuance of bond denied when appeal was from

23   subpoena compliance order); *In re* Capital West Investors, 180 B.R. 240, 242-43 (N.D. Cal.

24   1995), *rev'd on merits after stay denied*, 186 B.R. 497 (N.D. Cal. 1995) (appeal from plan

25   confirmation order not subject to Rule 62(d)); Government Guarantee Fund of Finland v.

26   Hyatt Corp., 167 F.R.D. 399, 400 (D.V.I. 1996) ("The loser in an action for an injunction thus

is not entitled to a stay by giving a supersedeas bond."); Stephenson v. Rickles Electronics & Satellites (*In re* Best Reception Systems, Inc.), 219 B.R. 988, 996 (Bankr. E.D. Tenn. 1998) ("[C]ourts have restricted the application of Rule 62(d)'s automatic stay to judgments for money because a bond may not adequately compensate a non-appealing party for loss incurred as a result of the stay of a non-money judgment.'"), *quoting* Hebert v. Exxon Corp. 953 F.2d 936, 938 (5th Cir. 1992).

This view is rooted in the text of Rule 62.  Rule 62(d) provides that its provisions regarding the provision of a supersedeas bond are "subject to the exceptions contained in subdivision (a) of this rule."  Rule 62(a), in turn, provides for a ten-day automatic stay of the effect of a judgment unless that judgment is a "final judgment in an action for an injunction."  Such injunctions include injunctions requiring specific performance, as was requested here.  Miller v. LeSea Broadcasting, Inc., 927 F.Supp. 1148, 1151 (E.D. Wisc. 1996).  *See also* Moore v. Townsend, 577 F.2d 424, 426 (7th Cir. 1978).  As stated by Wright, Miller & Kane: "[i]f the district court has denied an injunction . . . defendant is free to take the action sought to be enjoined . . . ."  11 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2904, at 498 (2d ed. 1995).

There is a procedure, of course, to obtain a stay in such circumstances.  Rule 62(c) fulfills this role.  Under Rule 62(c):

> When an appeal is taken from [a] . . . final judgment . . . denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.

The factors that the court must consider in analyzing Acton's request for an injunction under Rule 62(c) are:

> (1) whether the stay applicant has made a strong showing that he is

4

likely to succeed on the merits; (2) whether the applicant will be
irreparably injured absent a stay; (3) whether issuance of the stay
will substantially injure the other parties interested in the
proceeding; and (4) where the public interest lies.

Hilton v. Braunskill, 481 U.S. 770, 776 (1987).  *See also* 11 CHARLES A. WRIGHT, ARTHUR R.
MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2904, at 501 (2d ed. 1995).

Not surprisingly, these same factors have been incorporated under Federal Rule
of Bankruptcy Procedure 8005.  That rule states:

Notwithstanding Rule 7062 but subject to the power of the district
court and the bankruptcy appellate panel reserved hereinafter, the
bankruptcy judge may suspend or order the continuation of other
proceedings in the case under the Code or make any other
appropriate order during the pendency of an appeal on such terms
as will protect the rights of all parties in interest.

Courts in the Ninth and other circuits have construed this rule to incorporate essentially
the same standards as applicable under Rule 62(c).  *In re* Universal Life Church, Inc., 191
B.R. 433, 444 (E.D. Cal. 1995), *aff'd in part and dismissed in part*, 128 F.3d 1294 (9th Cir. 1997),
*cert. denied*, 524 U.S. 952 (1988).  *See also* Hunt v. Bankers Trust Co., 799 F.2d 1060, 1067 (5th
Cir. 1986);  Virginia Dep't of Med. Assistance Servs. v. Shenandoah Realty Partners, L.P. (*In
re* Shenandoah Realty Partners, L.P.), 248 B.R. 505 (W.D. Va. 2000); *In re* Holtmeyer, 229
B.R. 579, 581 (E.D.N.Y. 1999); *In re* Bradford, 192 B.R. 914, 917 (E.D. Tenn. 1996); Beneficial
Homeowner Service Corp. v. Moreau (*In re* Moreau) 135 B.R. 209 (N.D.N.Y. 1992); *In re*
Edwards, 228 B.R. 573, 575 (Bankr. E.D. Pa. 1999); *In re* Great Barrington Fair &
Amusement, Inc., 53 B.R. 237 (Bankr. D. Mass. 1985); 10 COLLIER ON BANKRUPTCY ¶ 8005.7
(15th rev. ed. 2005).

Accordingly, I have to assess Acton's request for a stay under the discretionary

1  standards of Rule 62(c) and 8005, not the more mechanical provisions of Rule 62(d). There

2  are thus four elements to consider: (1) Acton's likelihood of success on the merits; (2)

3  whether Acton will be irreparably injured; (3) whether issuance of the stay will

4  substantially injure Fullmer; and (4) where the public interest lies.   In applying these

5  factors, the court is mindful that a discretionary stay pending appeal is viewed as an

6  extraordinary remedy.  Minor Metals, Inc. v. United States, 38 Fed. Cl. 379 (Ct. Claims

7  1997).

8  **II.        Application of the Four Factors Related to Equitable Relief**

9           *A.        Acton's Success on the Merits*

10                  1.        Background on the Trial

11          During the trial, the court found that the Contract initially obligated Fullmer to

12  sell and Acton to buy real property in the northwest area of the greater Las Vegas

13  metropolitan area.  Both parties testified, as did Christopher White, who was Acton's and

14  Fullmer's real estate broker ("White").  Testimony was also received from three

15  individuals, Adam Knecht, Karl Wolff and Louis Hillegas, who purchased land from

16  Fullmer adjacent to the land covered by the Contract under terms virtually identical to

17  those in the Contract.

18          After consideration of the testimony and the pleadings, including the post-trial

19  briefs, the court denied the relief requested by Acton, and entered judgment in favor of

20  debtor and defendant, Fullmer.  Further, pursuant to Fullmer's request made at the

21  conclusion of the trial, the pleadings were deemed amended to conform to proof at trial

22  under Rule 7015.  Pursuant to this amendment, Fullmer was deemed to have

23  counterclaimed against Acton for declaratory relief to the effect that Acton was in material

24  breach of the Contract, and that Fullmer's obligations under the contract were terminated.

25  The court found for Fullmer on this counterclaim, and entered judgment thereon.

26

2.    <u>Background on the Contract</u>

Fullmer is a general contractor.  Before filing this chapter 11 case, he owned property he wished to develop into four residential lots.  Fullmer had signed contracts to sell those lots for $100,000 each.  After Fullmer filed his case, he moved to reject those contracts under Section 365, since by then the purchase prices were below market rates.  That motion was ultimately granted.

Freed from these pre-petition contracts, Fullmer then sought to resell the four lots.  There was a small problem, however.  The lots did not have APN designations (Assessor's Parcel Numbers), and thus under applicable state law Fullmer could not convey the lots individually.  Instead, Fullmer, through White, a real estate salesperson, took offers on the lots, with the understanding that they would be subdivided according to Fullmer's preliminary plans.  Within 48 hours of this decision, White had four offers of $160,000 each, one of which was Acton's.  Offers on the other three lots were made by Adam Knecht, Karl Wolff and Louis Hillegas, and, as applicable, their respective spouses.  As indicated above, each of these individuals testified at trial.

Each offer was prepared by White, and each was signed by the prospective purchasers.  More importantly for this case, each offer contained the following condition:

Buyer will be given 10 days to close escrow and purchase lot from

the day they [*sic*] receive written notice of successful subdivision.

This language proved to be the center of the controversy during the trial, although the debate about it would not be known for more than six months after all agreed to it.

Initially, everything was fine.  Fullmer sought and obtained court approval for the new contracts.  A hearing was held on March 17, 2004 at which time the bankruptcy judge withheld approval of the sales until Fullmer had conducted an auction for the lots; the court ordered this delay so that the individuals whose $100,000 contracts had been

rejected could bid.  In accordance with this order, an auction was held on March 24, 2004, but no one but the four $160,000 offerors showed up.  They declined to increase their bids, and thus the four written offers for $160,000 were attached to a motion for court approval. At a hearing on April 13, 2004, the court approved the motion, and thus the offers and sales related to them.  On April 26, the court entered an order formally approving contracts on the terms set forth in the offers, and approved the estate's sale of the lots to each of the four offerors.

The auction required each purchaser to deposit $8,000 in the trust account of Fullmer's lawyer, and authorized disbursement of those funds for water connection fees. Each purchaser paid the $8,000, and Fullmer used the funds as required.  As a result, sometime in July of 2004 Fullmer received approval to record his subdivision map, the official act that resulted in the issuance of APN designations for each of the four parcels.

After the recordation, White prepared and had all four purchasers, including Acton, sign an "Addendum to Purchase Agreement" (the "Addendum").  This was a half-page document prepared on a standard form.  It recited that the subdivision map had been recorded, and that "[a]s per original contract this is the written notice that escrow has been opened."  Apart from this notice function, it further stated that "the close of escrow will be on the 19th of July, 2004," and that "per request it is clarified in this addendum that lots are being sold with out all work being finished.  Seller does have all utilities and improvements approved by the county and will be finishing the work in a timely manner." In return, Fullmer obtained Acton's acknowledgment that failure to pay the purchase price as and when due would effectively terminate the Contract.  As the Addendum stated, "it is clarified if or when the ten days is [*sic*] up and we are set to close on said property and the buyer [Acton] is not ready the properties [*sic*] will be put back on the market."  Acton acknowledged that he signed the Addendum on July 9, 2004.  As a consequence, Acton acknowledged that his purchase price would be due on July 19th.

8

All purchasers except Acton then paid the balance of their purchase prices in July, and deeds conveying the property to each of them were thereafter recorded. Acton balked, however, claiming that without installation of all improvements (curbs, paving, utilities, grading, etc.), there could be no "successful subdivision." And without a "successful subdivision," Acton contended that his obligation to pay his purchase price had not yet matured.

Acton filed this action for specific performance on July 21, 2004, and filed a lis pendens against the property on the same day.

3.    Legal Arguments Regarding the Invalidity of the Addendum

Acton contends that the original offer controls, and that the court should not look to anything signed by him after the court approved the sale in April of 2004. His argument on this point is twofold: first, that anything signed after April lacked consideration, and thus is a legal nullity; and second, that anything signed after April was not approved by the court, and thus was void.

If these arguments fail, Acton argues that "successful subdivision" as used in the Contract means completion of *all* improvements, and thus the Addendum was an improper notice of the maturation of his obligation to pay the balance of the purchase price. Since Fullmer disagreed, Acton believes that Fullmer is in breach, and requests an order for specific performance requiring Fullmer to complete installation of all improvements.

Fullmer's position is that Acton's lawsuit is a material breach of the Contract, enabling Fullmer to terminate his obligations thereunder.

a.    *Lack of Consideration*

Acton's argument regarding a lack of consideration fails for two reasons. First, the offer Acton signed specifically noted that a further notice would be provided of the

1  time escrow was to close, and the provision of that notice was the primary function of the

2  Addendum.  No issue of consideration is thus presented with respect to the simple

3  provision of a notice anticipated by the Contract.  The notice was anticipated by the

4  original terms of the deal, and there is no dispute that Acton signed it.

5          What might be presented, however, is an issue of whether Fullmer

6  inappropriately gave the notice before he was entitled to under the terms of the Contract.

7  That issue, however, goes to breach of a valid contract, not to whether the Addendum was

8  a legally binding document that memorialized Acton's assent to the closing date.

9          With respect to validity, Acton admitted signing the Addendum, and further

10 admitted that he signed it without a complete understanding of what it required.

11 Nevertheless, the presumption is that he is bound by what he signed.  Campanelli v.

12 Conservas Altamira, S.A., 86 Nev. 838, 841, 477 P.2d 870, 872 (Nev. 1970) ("when a party to

13 a written contract accepts it is (sic) a contract he is bound by the stipulations and

14 conditions expressed in it whether he reads them or not. Ignorance through negligence or

15 inexcusable trustfulness will not relieve a party from his contract obligations. He who

16 signs or accepts a written contract, in the absence of fraud or other wrongful act on the

17 part of another contracting party, is conclusively presumed to know its contents and to

18 assent to them . . . ."), quoting Level Export Corp. v. Wolz, Aiken & Co., 305 N.Y. 82, 111

19 N.E.2d 218 (1953).[1]

20

21

22          [1]As summarized by the late Professor Farnsworth:

23

24          The fact that one gives the matter no thought does not impair the effectiveness
           of one's assent, for there is no requirement that one intend or even understand
25          the legal consequences of one's actions.  For example, one who signs a writing
           may be bound by it, even though one neither reads it nor considers the legal
26          consequence of signing it. This rule, making a party's intention to be legally

Acton argues, however, that to the extent that the Addendum altered legal rights, it was not bargained for.  Specifically, Acton argues that the Addendum's acknowledgment that Fullmer did not have to install improvements before the purchase price was due is not binding against him since Fullmer gave no legal consideration for it.

Nevada law governs the Contract, and so Nevada law on consideration is relevant here.  Nevada adopts the *Restatement of Contracts* view of consideration that "'[t]o constitute consideration, a performance or return promise must be bargained for.  A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.'" Pink v. Busch, 100 Nev. 684, 688, 691 P.2d 456, 459 (Nev. 1984), *quoting* RESTATEMENT (SECOND) OF CONTRACTS § 71(1), (2) (1981).  *See also* Zhang v. Eighth Judicial Dist. Court of State *ex rel*. County of Clark, 103 P.3d 20, 23-24 (Nev. 2004) (referring to "better-reasoned view" of the pre-existing duty rule under the *Restatement*); Berge v. Fredericks, 95 Nev. 183, 187, 591 P.2d 246, 247 (Nev. 1979) (adopting test in context of a contract for marriage); Unruh v. Nevada Nat. Bank, 88 Nev. 427, 429, 498 P.2d 1349, 1350 (Nev. 1972).

As a result, if Fullmer promised to do or refrain from doing anything in exchange for Acton's acknowledgment of the closing date, Acton is bound by the Addendum.  But Acton contests that Fullmer gave up anything.  In particular, Acton contests that Fullmer exchanged anything of value for that part of the Addendum that states, "[P]er request it is clarified in this addendum that lots are being sold with out all work being finished.  Seller does have all utilities and improvements approved by the

---

bound irrelevant, has the salutary effects of generally relieving each party to a dispute of the burden of showing the other's state of mind in that regard and of helping to uphold routine agreements.

1 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.7 (2d ed. 2001).

county and will be finishing the work in a timely manner."[2]

Acton argues that the recent case of Zhang v. Eighth Judicial Dist. Court of State *ex rel*. County of Clark, 103 P.3d 20 (Nev. 2004) supports his position. In that case, Zhang had a contract for sale of a house, and entered into a replacement contract for that house that changed the original contract in only one respect: an increased price. When Zhang sought to close on the earlier, cheaper contract, the seller refused to sell, and litigation ensued.

The Nevada Supreme Court dispensed with the seller's argument by invoking the pre-existing duty rule. Since the seller's bundle of obligations did not change, there was no consideration for the modification. Even the argument that the new agreement represented a novation, and thus the requisite bargained-for exchange was provided by the mutual rescission, could not save the seller's position:

> But the better reasoned approach is articulated in the *Restatement (Second) of Contracts* and *Corbin on Contracts*, which reject the notion that rescission of a contract that is executory on both sides supplies consideration for a simultaneous new agreement differing in terms of promised compensation. . . . Further, the Restatement and Corbin express concern that overlooking the preexisting duty rule for a simultaneous rescission/modification might permit fraudulent or unfair modifications.

*Zhang*, 103 P.2d at 23-24 (citations in original omitted).

---

[2]If valid, of course, Acton would have no cause of action for breach. With the concession that lots were "being sold with out all work being finished," Acton would be contractually bound to accept that Fullmer's demand for final payment was timely.

The problem with Acton's argument is that Fullmer did not propose a novation or a rescission. Thus, *Zhang*, and its salutary effort to block evasions of the pre-existing duty rule, is not applicable.

But it is also not the case that Fullmer failed to provide consideration for Acton's acknowledgment. The text of the Addendum recites that there was some need for "clarification"; that is, there was some dispute – or need for clarification – over when the improvements were to completed. By executing the Addendum, the parties resolved this point, and their consent to this clarification essentially surrendered this issue. In short, Acton agreed to close without all improvements being done, and Fullmer agreed not to treat Acton's prior actions as a breach. As noted by the Ninth Circuit, when interpreting Nevada law:

> the general principle of contract law that "[f]orbearance to assert or the surrender of a claim or defense which proves to be invalid is not consideration unless (a) the claim or defense is in fact doubtful because of uncertainty as to the facts or the law. . . ." *Restatement (Second) of Contracts* § 74(1)(a) (1981).

Union Oil Co. of California v. Terrible Herbst, Inc., 331 F.3d 735, 741 (9th Cir. 2003).

As a result, Acton's undertaking in the Addendum — to close on July 19th — was supported by Fullmer's continued preparation for closing instead of for litigation. In short, in light of Acton's purported anticipatory repudiation, for which "clarification" was sought, Fullmer agreed to refrain from suing Acton. Put another way, it is a fair reading of the document that Acton signed that Fullmer had contemplated, in the absence of "clarification," to declare the Contract terminated and seek other purchasers. This was not a frivolous claim, as the remainder of this opinion underscores. Fullmer's implied promise to continue with Acton after he signed the Addendum thus provided the necessary

13

consideration.[3]  *Cf.* United Services Auto Ass'n v. Schlang, 111 Nev. 486, 493, 894 P.2d 967, 971 (Nev. 1995) (court will imply promise when "apparent that a binding contract was intended.").[4]

Acton is thus bound, at least under Nevada law, to the terms of the Addendum. But he has another argument that, even if consideration were given, he is not bound.

---

[3]Yet another interpretation of the Contract would have the Addendum serve as proof of Acton's adequate assurance of future performance; that is, upon Acton's balking at closing, Fullmer requested and received adequate assurance in the form of the Addendum.  This interpretation would also not require consideration for the request (since Acton was already bound by the implied obligation to provide such adequate assurance), but Nevada has yet to rule as to whether such an implied obligation exists in contracts governed by the common law.  *See* Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 682 N.Y.S.2d 664, 705 N.E.2d 656 (1998)  (finding obligation to provide adequate assurance of future performance a part of the common law); RESTATEMENT (SECOND) OF CONTRACTS § 251 (1981).

[4]Alternatively, the Addendum can be viewed as a simple modification to the Contract, which, under modern contract law, does not require formal consideration.  This view is embodied in Section 89 of the *Second Restatement of Contracts*:

> A promise modifying a duty under a contract not fully performed on either side is binding:
> (a) if the modification is fair and equitable in view of circumstances not anticipated by the parties when the contract was made; or
> (b) to the extent provided by statute; or
> (c) to the extent that justice requires enforcement in view of material change of position in reliance on the promise.

*See also* U.C.C. § 2-209(1) (stating consideration not necessary to support the modification of a contract under the Uniform Commercial Code).  The court does not rest on this ground, however, since the Nevada Supreme Court has yet to adopt Section 89, although it consistently tends to follow the *Restatement of Contracts*.  *See* Union Oil Co. of California v. Terrible Herbst, Inc., 331 F.3d 735, 741 (9th Cir. 2003).

b.    *Lack of Necessary Court Approval Under Section 363*

Acton next argues that the Addendum is void because no bankruptcy court approval was sought or obtained for it.  Again, to the extent the Addendum sets a closing date in accordance with the original offer and Contract, no authorization was necessary, as such actions were already contemplated and present in the Contract when the court approved it.  But even if the Addendum did modify the Contract, it is not invalid for lack of authorization.  The changes effected by the Addendum were, for the most part, anticipated by the original Contract; no one disputes that the obligation to pay would be triggered by completion of a "successful subdivision."

Moreover, even if the changes weren't explicitly anticipated, they were reasonably foreseeable and did not materially change the estate's obligations.  Approval by the court of a transaction outside of the ordinary course of business under Section 363(b) does not set in stone all terms approved, leaving no room for any modifications, unless what is approved is a judicial sale pursuant to some form of auction with skeleton terms. *See, e.g.*, Winston Inn & Restaurant Corp. v. DeMichiel (*In re* Winston Inn & Restaurant Corp.), 120 B.R. 631 (E.D.N.Y. 1990).

Here, the court did not approve a judicial sale.  Rather, it authorized the entry by the estate (via Fullmer) into contracts, the forms of which had been presented to the court and noticed to creditors.  By proceeding in this fashion, rather than by a straight judicial sale, the estate (and not the court) became the seller, and approved the sale terms for each sale.  Those terms, however, contained a process for amendment. Section 16 of the Contract said, "This Agreement may be modified only in writing signed and dated by both parties."  Thus the court approved a modification process, and the Addendum conformed to this process.

Such flexibility is desirable when the parties elect to proceed by approved standard contract rather than by a judicial sale.  When non-debtors are able to purchase

from the estate on terms and conditions not necessarily satisfied at the time of court approval, common sense dictates that minor changes agreed to by all parties need not be renoticed and be placed on the court's docket.  For example, the approval of a contract that called for a closing 30 days after the entry of the order approving the sale would not preclude the parties from agreeing to closing in 20 days so long as there was no adverse effect on the estate.

Indeed, this type of flexibility is inherent in the Code's decision to divide those activities that require court approval by whether the activity was in the "ordinary course" of the debtor's business.  *See* 11 U.S.C. § 363(b)(1), (c).  Fullmer's pre-petition creditors assumed the risk of transactions that were in the ordinary course of Fullmer's pre-petition business, and thus no court approval is required for such ordinary course transactions. *See* Burlington Northern R.R. Co. v. Dant & Russell, Inc. (*In re* Dant & Russell, Inc.), 853 F.2d 700 (9th Cir. 1988). Transactions outside the norm, however, require the independent review of the court and the creditor body.  11 U.S.C. § 363(b)(1).

As a consequence, an estate representative (the role here assumed by Fullmer as debtor in possession) may amend contracts for sales approved by the court so long as the modification itself is of a type that the debtor could or would have made in the ordinary course of its pre-petition business, and so long as the change does not materially modify the estate's obligations.  *See In re* Dant & Russell, 853 F.2d at 704-06.

Here, the change was the type of transaction that was in the ordinary course of the debtor's business — a modification of an existing contract to set closing dates or to clarify terms.  Contractors such as Fullmer execute such types of changes all the time, and there was testimony at trial to that effect.  And the change did not result in an adverse effect on the debtor's estate.  It either clarified and set the closing date in accordance with the original contract (as the court found at trial), or it set a concrete date for Acton's payment of the purchase price which, in turn, would aid the estate in recovering whatever

16

profit there was to be realized on the sale.[5]

All of this means that the Addendum was part and parcel of the Contract.  It was anticipated and authorized by the original offer signed by Acton, and thus was anticipated and authorized by the court's order approving the sale.[6]  None of this matters, however, if there was not a "successful subdivision," as that term was used in the Contract.

4.    Construction of the Term "Successful Subdivision"

a.    *Initial Procedural Issues*

At the beginning of the trial, the court ruled that a series of Acton's requests for admission had been deemed admitted because of Fullmer's failure to respond to them.  These admissions were potent and potentially dispositive — they included admissions that a "successful subdivision" included the installation of offsite improvements such as water, power, and paving, and an admission that these offsite improvements had not been installed.[7]  This ruling was based on Acton's counsel's claim of prejudice in marshaling his

---

[5]Moreover, even if the change required court approval, Acton does not have standing to contest it.  Under Section 549 of the Bankruptcy Code, unauthorized post-petition transactions may be avoided.  The key word is "may."  Avoidance is discretionary with the representative of the estate.  If Acton had any questions about the estate's performance of its duties, he could have filed an action requesting clarification, or sought to compel the estate to avoid the Addendum.  He did neither.

[6]A lot of pain would have been avoided, however, if Fullmer's counsel had borrowed a page from a corporate lawyer's textbook and inserted a clause in the order authorizing the estate, via Fullmer, to take such actions, including any conforming or clarifying amendments, as were necessary and appropriate to conclude the sale.

[7]There were other admissions that were not responded to, but they required Fullmer to make legal conclusions – such as the existence of consideration and the scope of this court's authorization order – that were legal conclusions, and therefore the request for such admissions was improper.  *See* Gallegos v. City of Los Angeles, 308 F.3d 987, 993 (9th Cir. 2002) (police officer permitted to withdraw admission that stop was arrest in civil action under Section 1983 since allowing such admission would "confuse" the issues in the case).

17

proof on the meaning of "successful subdivision."  BANKR. R. 7036 (incorporating FED. R. CIV. PRO. 36(b)).

Notwithstanding the explicit ruling that Acton's requests for admission would be deemed admitted, counsel for Acton persisted in introducing evidence and asking questions about the scope of the term "successful subdivision."  Indeed, he even questioned his own client on these terms.  Of course, counsel for Fullmer took advantage of these opportunities to further Fullmer's theory through the evidence thus adduced. These questions and actions effectively reopened the issue, as they contradicted the earlier assertions that proof at trial of such issue would prejudice Acton's case.  "'The prejudice contemplated by Rule 36(b) . . . relates to the difficulty a party may face in proving its case,' including problems 'caused by the unavailability of key witnesses,' or 'the sudden need to obtain evidence with respect to the questions previously deemed admitted.'" Gallegos v. City of Los Angeles, 308 F.3d 987, 993 (9th Cir 2002), *quoting* Hadley v. United States, 45 F.3d 1345, 1348 (9th Cir. 1995) *and* Brook Village N. Assocs. v. General Elec. Co., 686 F.2d 66, 70 (1st Cir.1982).  *See also* Manatt v. Union Pacific R.R., 122 F.3d 514, 517 (8th Cir. 1997), *cert. denied*, 522 U.S. 1050 (1998); 8A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FED. PRAC. & PROC. CIV. § 2264 (2d ed.1994 & Supp. 2004).

Since Acton was clearly ready and prepared to present evidence on the scope of "successful subdivision," there would be no prejudice in allowing evidence on the point and holding that the issue was back in play.  In short, Acton waived the benefit of the deemed admission.  In the words of Rule 36(b), his waiver and lack of prejudice help establish that "the merits of the action would be subserved" by determination from the proof adduced the meaning of "successful subdivision."  Fullmer's counsel requested and

received a ruling to that effect at the close of testimony.[8]

> **b.**    *The Contractual Meaning of "Successful Subdivision"*

From the beginning, the Contract conditioned payment by Acton on completion of a "successful subdivision." Acton's interpretation of this phrase takes the not unreasonable view that a "successful subdivision" is one in a state or condition suitable for Acton to begin building; that is, the streets would be paved, the land graded, and all utilities available for hook-up.

While that definition is not unreasonable, it is by no means the only reasonable interpretation. "Successful" could have just as easily been construed as Fullmer contends; that is, "successful" meant in a state in which Fullmer could legally convey title to the particular lot purchased. Under Nevada law, "[a] contract . . . is ambiguous if it is reasonably susceptible to more than one interpretation." Econ. Forms Corp. v. Law Co., Inc., 593 F. Supp. 539, 540 (D. Nev. 1984). As "successful subdivision" is ambiguous under this standard, the parties proffered parol evidence of their views as to its meaning. *See* Stratosphere Litigation L.L.C. v. Grand Casinos, Inc., 298 F.3d 1137, 1141 (9th Cir. 2002) (interpreting Nevada law); Farmers Ins. Exch. v. Young, 108 Nev. 328, 334 n.3, 832 P.2d

---

[8]Acton's counsel continued his odd behavior throughout trial and following judgment. As one example, at trial, he attempted to prove mismanagement by Fullmer through cross-examination. In this effort, he stopped trial to demand an easel and marker (which he had not requested before trial) and then tried to force Fullmer to recreate, on the fly, his profit and loss for the project. Not only was this irrelevant to the claim of specific performance, it was bungled badly. After giving counsel much latitude, the court stopped the testimony because Acton's counsel persisted in mischaracterizing Fullmer's testimony, and it was rambling.

After trial, Acton's counsel filed a brief contending that the ten day stay of Bankruptcy Rule 7065 did not count weekends (which was clearly wrong), and even cited the rule in his brief (Bankr. R. 9006) that proved him wrong. The court reserves judgment on whether to sanction Acton's counsel under Rule 9011 for failing to read his own pleadings before signing them.

376, 379 n. 3 (Nev. 1992); Union Bldg. Materials Corp. v. Haas & Haynie Corp., 577 F.2d 568, 572 (9th Cir. 1978) ("Extrinsic evidence is properly admitted to help ascertain the intended meaning of ambiguous writings.").

When presented with contracts with ambiguous terms, the Nevada Supreme Court has recently stated:

> The best approach for interpreting an ambiguous contract is to delve beyond its express terms and "examine the circumstances surrounding the parties' agreement in order to determine the true mutual intentions of the parties." This examination includes not only the circumstances surrounding the contract's execution, but also subsequent acts and declarations of the parties.

Shelton v. Shelton, 119 Nev. 492, 78 P.3d 507, 510 (Nev. 2003). *See also* Ringle v. Bruton, 120 Nev. 82, 86 P.3d 1032, 1039 (Nev. 2004).

Following *Shelton*, this court heard the testimony not only of Acton and Fullmer, but also that of White and each of the other three purchasers (who had virtually identical terms in each of their contracts with Fullmer). This evidence overwhelmingly favored Fullmer's interpretation. Fullmer testified that completion of a "successful subdivision" meant the recordation of the related subdivision map, which then resulted in the issuance of APN designations, and the potential to convey the individual lots to separate buyers. This understanding was shared by the other three purchasers from Fullmer, who each bought at the same time, in the same manner and under very similar, if not identical, terms. Finally, this was the understanding of White, the real estate broker, who was not only Fullmer's agent, but also Acton's agent, and the person who penned the disputed clause in each of the four offers.

In addition, there was evidence that Fullmer's interpretation was standard in the construction industry; that is, that Fullmer's interpretation was consistent with trade

usage.   Warrington v. Empey, 95 Nev. 136, 139, 590 P.2d 1162, 1163-64 (Nev. 1979) (trade custom admissible to interpret terms used in real estate industry).   There was evidence from the other purchasers, two of whom were in the construction business, that "successful subdivision" means in the trade exactly what Fullmer said it meant: recordation of the subdivision map and issuance of APN designations.   As Acton was not naive in matters of land sales, and also works in the construction trade, the court finds that he knew, or should have known, that the trade usage was incorporated into the Contract.

Finally, all the purchasers but Acton testified that they understood that Fullmer needed the balance of their purchase price to complete the necessary improvements.   There was testimony that this need was publicly stated at the auction just preceding the court's approval of the sale.   White confirmed this testimony.

The witnesses also testified that such an understanding was somewhat contrary to normal practice.   Typically, the contractor uses other funds – his own, or a construction loan – to install such improvements, and the purchase price then either reimburses the contractor or pays off the construction loan.   But such practices can vary, and the testimony provided three reasons why it varied in this case.   First, the court credits the testimony that all purchasers, including Acton, were told that the balance of their funds was necessary to complete the improvements.   Second, the purchasers were compensated for such variance by receiving prices that were somewhat below market; indeed, two of the purchasers have subsequently listed their lots for prices in excess of $240,000, and there was testimony that before the Addendum was signed, one of the purchasers offered to buy Acton's parcel for $200,000.   Finally, the court's order approving the sales explicitly required Fullmer to complete all improvements without regard to timing; that is, the court's order superseded the normal custom that the developer's obligations to install improvements ended on the date of conveyance, and required him to complete the

1  improvements.[9]

2       Against this background, the court finds that the term "successful subdivision"

3  in the Contract meant the date that the subdivision map was recorded, and that Acton, not

4  Fullmer, was in breach for the actions taken after the Addendum was signed.  As a

5  consequence, Fullmer should prevail on the merits.  But there is one additional reason that

6  Fullmer should prevail.

7              5.    Undue Supervision

8       Finally, even if Acton were to prevail on all of his points, this court would not

9  enter a decree of specific performance.  Acting in equity, courts have the discretion to

10 decline to order specific performance when such an order would require undue

11 supervision by the court in ensuring compliance with its order.  As stated by the late

12 Professor Farnsworth:

13       A court will not grant specific enforcement or an injunction if this

14       would impose on it burdens of enforcement or supervision that are

15       disproportionate to the advantages to be gained.  This limitation is

16       most often invoked in connection with construction contracts. The

17       burdens may be particularly heavy if judging the quality of the

18       performance poses difficult problems or if supervision will be

19       required over an extended period of time.

20 3 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 12.7 (2d ed. 2001).  *See also* CBL &

21 Assocs. v. McCrory Corp., 761 F. Supp. 807, 809 (M.D. Ga. 1991) (finding that specific

22 performance only appropriate when contract is "'definite, certain and clear, and so precise

23 _____

24       [9]This clause in the order approving the sale should have, and was meant to, assuage
   any concerns Acton or any other purchaser may have had regarding Fullmer's obligations
25 continuing after closing, and thus nullified the result that would have obtained under state
   law.  *See* Thornton v. Agassiz Constr., Inc., 106 Nev. 676, 799 P.2d 1106 (Nev. 1990).
26

                              22

in its terms as to the thing or things to be done by the party whose performance is sought to be compelled that neither party can reasonably misunderstand it.'"), *quoting* Martin v. Bohn, 227 Ga. 660, 662, 182 S.E.2d 428, 430 (Ga. 1971); Dahlberg Bros., Inc. v. Ford Motor Corp., 272 Minn. 264, 275, 137 N.W.2d 314, 322 (Minn. 1965).

This equitable principle appears to have been adopted in Nevada.  In Carcione v. Clark, 96 Nev. 808, 811, 618 P.2d 346, 348 (Nev. 1980), the question was whether specific performance had been properly ordered when there were certain conditions that had to be supervised.  In finding that a trial court could order specific performance when such conditions exist, it stated that specific performance is only appropriate when "the court is willing to order it." *Id.*  Given that the trial court in that case "was willing to supervise performance of the agreement," the court let the decree stand. *Id.*  The case here presents the converse: declining to consider specific performance because of the attendant need to supervise Fullmer's performance under the construction contract.  If *Carcione* grants Nevada courts the discretion to supervise specific performance, then it also means that they have the discretion to decline such supervision.

Normally, with a decree of specific performance to convey a piece of property, the act of conveyance is sufficiently simple that it can be ordered without involving the court in the minutiae of the dispute.  Here, however, Acton would have had the court supervise whether the land was properly graded, whether the street was adequately paved, and whether utilities were sufficiently available.  The court declined to act as a construction monitor, and thus would have denied the requested relief in any event.

### 6.   Resolution After Trial on Merits

After trial, the court concluded that when Acton signed the Addendum, he simply acknowledged that a condition to his obligation to pay the purchase price had been satisfied; that is, he acknowledged that there had been a successful subdivision, and his obligation to pay the purchase price had matured.  This conclusion is true regardless of

whether the Addendum is given effect as an amendment to the Contract or not.  This court found that the Addendum, whatever its other purposes, served to put parties on notice of closing in a manner anticipated by the original contract, and which was within the court approval that was obtained.

The court also found that the notice contained in the Addendum was seasonably provided.  There was, in short, a "successful subdivision," thereby entitling Fullmer to set a closing date that triggered Acton's obligation to deliver the remainder of the purchase price.  When Acton did not pay the purchase price, and instead elected to file his action for specific performance, he, not Fullmer, breached the Contract.  The court thus denied the relief sought by Acton.

In addition, the court granted Fullmer his requested relief for a determination that Acton's conduct was a material breach of Contract.  Clearly, failure to pay the purchase price when due is a material breach of any contract.  *See* Young Elec. Sign Co. v. Fohrman, 86 Nev. 185, 188, 466 P.2d 846, 847 (Nev. 1970).  Upon material breach, the non-breaching party may elect to suspend performance, may elect to cancel the contract, or may elect to terminate the contract and sue for damages.  Goldston v. AMI Investments, Inc., 98 Nev. 567, 569, 655 P.2d 521, 523 (Nev. 1982) ("A seller of land pursuant to a contract of sale is justified in cancelling the contract if the purchaser has failed to perform a material part of the contract which is a condition concurrent or precedent to the seller's obligations to perform. . . . Failure to tender timely performance can constitute a material breach of contract."); RESTATEMENT (SECOND) OF CONTRACTS § 237 (1981).

 Fullmer chose the middle option: cancellation of the Contract.  Accordingly, this court entered its judgment on Fullmer's counterclaim to the effect that the Contract had been canceled, and that Fullmer was thereby free to resell the property.  In addition, the court ordered that Acton's lis pendens be expunged.

B.    *Irreparable Injury*

Even though he has little likelihood of success on the merits, Acton argues that the other factors regarding a stay pending appeal favor his case.  He is wrong.

Initially, Acton claims that land is unique, and that the refusal to issue a stay will irreparably injure him through the loss of the ability to buy the land at issue.  He is undoubtedly correct that Nevada law historically has treated land as unique, and thus a breach of an agreement to sell real property cannot be adequately compensated by monetary damages.  *See* Stoltz v. Grimm, 100 Nev. 529, 533, 689 P.2d 927, 930 (Nev. 1984); Carcione v. Clark, 96 Nev. 808, 811, 618 P.2d 346, 348 (Nev. 1980).[10]

But Acton did not request specific performance in the form of a simple conveyance of land; instead, his complaint requested that Fullmer be ordered to complete his not-insubstantial duties under the Contract, and then convey the property.  As noted above, even had Acton proved his case for breach, the court would not have entered an order for specific performance of the construction contract.  *See Carcione,*  96 Nev. at 811, 618 P.2d at 348 (specific performance only available when "the court is willing to order it.").  Thus, the denial of a stay at this point would not result in injury to Acton since he would not have received the requested relief even had he prevailed on the merits of his breach claim.

In addition, Acton alleges that failure to grant a stay will result in his permanent loss of the ability to acquire the Property, and that any subsequent sale by Fullmer will effectively moot his appeal, thus irreparably injuring him.  Although the issue is not free from doubt, the majority of cases that have considered the issue have held that the risk that an appeal may become moot does not by itself constitute irreparable injury.  *In*

---

[10]This is certainly the accepted wisdom of the common law, although anyone who drives 50 or so miles north, south, east or west into the desert surrounding Las Vegas may find reasonable grounds to disagree that land is always unique.

*re* Convenience USA, Inc., 290 B.R. 558, 563 (Bankr. M.D.N.C. 2003); *In re* Sunflower Racing, Inc., 223 B.R. 222 (D.Kan.1998); *In re* 203 N. LaSalle St. Partnership, 190 B.R. 595 (N.D. Ill.1995); *In re* Best Prods. Co., 177 B.R. 791 (S.D.N.Y.1995); *In re* Moreau, 135 B.R. 209 (N.D.N.Y.1992); *In re* Asheville Bldg. Assocs., 93 B.R. 920 (W.D.N.C.1988); *In re* Kent, 145 B.R. 843 (Bankr. E.D. Va.1991); *In re* The Charter Co., 72 B.R. 70 (Bankr. M.D. Fla.1987); In re Great Barrington Fair & Amusement, Inc., 53 B.R. 237 (Bankr. D. Mass.1985); *In re* Baldwin United Corp., 45 B.R. 385 (Bankr. S.D. Ohio 1984). *But see In re* Country Squire Assocs. of Carle Place, L.P., 203 B.R. 182 (2d Cir. B.A.P. 1996); *In re* St. Johnsbury Trucking Co., 185 B.R. 687 (S.D.N.Y.1995); *In re* Advanced Mining Sys., Inc., 173 B.R. 467 (S.D.N.Y.1994); *In re* Grandview Estates Assocs., Ltd., 89 B.R. 42 (Bankr. W.D. Mo.1988).

Here, denial of the stay results only in a potentially moot appeal if Fullmer can make the required showings under Section 363(b) to enable him to resell the property to someone else. Acton will have the status of a party in interest with respect to any such request and will be able to make his arguments then as to why resale would not be in the best interests of the estate. If unsuccessful, however, Acton will have something that most disappointed buyers at common law do not have: the benefit of a court ruling that resale is in the best interests of the seller. In this situation, Acton has more protection and opportunity to be heard than in the normal case of the disappointed buyer; he will have the benefit of notice and a hearing that the land at issue will be sold. Given this increased level of participation and protection, and given this court's view that irreparable injury cannot be shown solely from the possibility that an appeal may be moot, Acton has thus not established that denial of a stay will cause him irreparable injury.

C.    *Substantial Injury to Fullmer*

Fullmer contends that a stay pending appeal will cause him substantial injury in the form of deprivation of the ability to reorganize. In the analogous context of injunctions against creditors' actions against chapter 11 insiders necessary for the debtor's business,

courts have found that the loss of the ability to reorganize is essentially irreparable injury. *In re* Monroe Well Serv., Inc., 67 B.R. 746, 752-53 (Bankr. E.D. Pa. 1986). *See also* North Ala. Anesthesiology Group, P.C. v. Zickler (*In re* North Ala. Anesthesiology Group, P.C.), 154 B.R. 752, 764 (N.D. Ala. 1993); *In re* Environmental Waste Control, Inc., 125 B.R. 546, 551 (N.D. Ind. 1991); 2 COLLIER ON BANKRUPTCY ¶ 105.02[2] (15th rev. ed. 2005).

Here, Fullmer contends that if he is not able to resell the land to another individual, he will be unable to complete the project, and will have large claims come due to his various bonding companies. This contention is consistent with his testimony at trial, and the court credits it. The court also notes that the Office of the United States Trustee has sought to dismiss Fullmer's case, or convert it to a chapter 7, with the main argument being that Fullmer has not been able to show profitable operations. The reason for that, in turn, is that Acton breached his obligations to pay Fullmer.

As a consequence, the extension of this litigation, through a stay pending appeal, would substantially harm Fullmer by depriving him of the ability to reorganize. This is injury that is hard to quantify. While the cost of the project may be quantifiable, there is more than just cost at stake. Fullmer's reputation and ability to bid successfully for future jobs is also at issue; that is the essence of his individual chapter 11 reorganization case. In a pending motion to approve entry into a new contract for sale, Fullmer has attempted to demonstrate that such a resale contract is in the best interests of the estate. The intangible and difficult to calculate aspects of these injuries also militate in favor of setting no bond, since the injuries that would flow from Fullmer's loss of the ability to reorganize are injuries that cannot be counted with any certainty.

D.    *Public Interest*

The interest of the public in a stay pending appeal is slight. In the context of preliminary injunctions, from which this factor is borrowed, considerations of the public interest involve testing whether the relief requested would affect the public at large, as

opposed to the immediate parties to the appeal.  *In re* Richmond Metal Finishers, Inc., 36 B.R. 270, 273 (Bankr. E.D. Va. 1984).  Examples would include injunctions against labor strife that affected more than just the immediate parties, such as the strike by a municipal bus drivers' union, or an injunction against a polluter of a local river.

To the extent that the public interest has been considered in the bankruptcy context, courts have identified the achievement of reorganization as a public interest worthy of protection.  *In re* Convenience USA, Inc., 290 B.R. 558, 568 (Bankr. M.D.N.C. 2003); *In re* Richmond Metal Finishers, Inc., 36 B.R. at 273; First Pennsylvania Bank NA. v. Intermet Realty P'ship (*In re* Intermet Realty P'ship), 27 B.R. 938, 940 (Bankr. E.D. Pa. 1983).

Here, the public interest favors allowing Fullmer to return to his reorganization effort and try to return the property at issue to productive use.

E.    *Balancing the Equities*

On balance, Fullmer prevails.  He is likely to prevail on appeal and will suffer substantial injury if a stay is put in place pending the appeal.  While Acton's argument that land is unique has some superficial appeal, it is clear that conveyance of the land is not the only action sought to be specifically performed, and this court has already indicated that it would not supervise Fullmer in the completion of his duties under the Contract.  To the extent consideration of the public interest is implicated, it also favors Fullmer in his efforts to reorganize.

**III.    Conclusion**

The relevant factors indicate that Fullmer would suffer more injury and damage by a stay than would Acton, and that Fullmer has a better chance of a positive outcome on appeal.  Accordingly, this court will deny Acton's request to stay the proceedings here pending appeal.

A separate order under Bankruptcy Rule 9021 will be entered concurrently.

Copies sent to:

David Mincin
Law Offices of Richard McKnight, P.C.
330 South Third Street
Las Vegas, NV 89101

Richard McKnight
330 South Third Street, #900
Las Vegas, NV 89101

Patrick W. Fullmer
P.O. Box 34870
Las Vegas, NV 89133

Michael J. Harker
Boggess Harker & Money
7201 West Lake Mead Blvd., Ste 210
Las Vegas, NV 89128

Dept. Of Justice
Office of U.S. Trustee
300 Las Vegas Blvd. South
Las Vegas, NV 89101

# # #